# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

NORFOLK AND PORTSMOUTH TRACTION CO. v. DAILY'S ADMINIS-
TRATOR.

January 12, 1911.

Absent, Harrison, J.

1. PLEADING—*Allegation and Proof—Case at Bar.*—The rule that a defendant cannot be summoned to answer one case, and at the trial be obliged to meet another and entirely different case does not apply to the case at bar, as the evidence offered was to show that the conditions stated in the declaration existed, and that it was reasonably to be expected by the defendant that an injury such as in fact was inflicted would result therefrom.

2. ELECTRICITY—*Connection of Wires—Allegation and Proof.*—In an action to recover for death occasioned by lightning passing from a trolley wire to a "light wire," in consequence of a connection negligently maintained between the two wires by the defendant, a charge in the declaration that the "light wire" was connected with the trolley wire is sustained by proof that, although there was no actual physical connection between the two wires, they were in such close proximity that lightning would jump from one to the other.

3. ELECTRICITY—*Traction Companies—Lightning Arresters—Duty to Install—Care Required—Opinion Evidence.*—The measure of care required of a traction company with respect to its duty to install and maintain lightning arresters along its line of railway to prevent injury to persons and property is "ordinary care," the test of which is the practices and customs of others engaged in a like business, and a witness who has no knowledge of such customs and practices cannot give his opinion as to whether or not such an arrester at a particular point would have rendered the wire safe against lightning. The unbending test of negligence is to be found in the ordinary usage of the business.

4. ELECTRICITY—*Care in Use—Negligence—Ordinary Care.*—A traction company, in extending a wire from its trolley wire to a building for lighting purposes, is not required to guarantee the

safety of the wire against accidents from lightning, but is re
quired to exercise that due and ordinary care which the present
state of scientific knowledge, as well as the common observa-
tion of the nature of electricity, and the enormous power of
lightning would suggest as reasonably necessary for the pro-
tection of life along its line and wires.

5. PLEADING—*Declaration—Disregarding a Count—Evidence to Sup-
port.*—When there is evidence tending to prove a case stated
in one count of a declaration it is not error to refuse to in-
struct the jury to disregard that count.

Error to a judgment of the Circuit Court of Norfolk county
in an action of trespass on the case. Judgment for the plain-
tiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Williams & Tunstall*, for the plaintiff in error.

*Thorp & Bowden*, for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

Rufus Daily, as administrator of Mary Elizabeth Daily,
brought this action and recovered a judgment against the Nor-
folk and Portsmouth Traction Company for the sum of $5,000,
as damages awarded by the jury for the death of plaintiff's in-
testate, caused, it is alleged, by the negligence of the de-
fendant.

The defendant operates a line of street railway running
from Berkley ward, in the city of Norfolk. to Money Point, in
Norfolk county, Virginia. The plaintiff, on the day of the in-
jury to his decedent, who was also his daughter, was the owner
of a certain small frame house, used as a cook shop, situate
in Norfolk county, at a place called South Hill. This house
was on the right-hand side of the defendant's track looking
in the direction of Money Point, and the line of railway run-

ning past this house was operated by the overhead trolley system. In front of the house, and between it and the track of the defendant, was a platform, which was used by the defendant as a station to handle its passengers getting on and off the cars at South Hill. In the front of plaintiff's house was a door, affording access thereto and egress therefrom, and immediately over this door was a cluster of electric lights installed by the defendant for the purpose of lighting this station, and these lights were, before they failed, as will be mentioned, supplied with the current from the trolley wire of the defendant extending over its track, the lights having formerly been connected with the trolley wire by a wire (generally spoken of as the "light wire") at a point (a little to the Money Point side of the house) where the trolley wire was supported by the arm extending out from a pole, and which ran from the trolley wire to the top of the pole, thence down to and on the house, thence into the cluster of lights, and thence down the side of the house into the ground and back to the rail, thus completing the circuit over which the current of electricity supplied the lights; but at the time of this accident these lights were not so connected as to be capable of being operated, and had not been for some months theretofore, the plaintiff's witnesses testifying that the wire connecting the lights with the ground had become broken, and thereby the circuit was broken, preventing the lights from being operated.

On the 15th day of August, 1908, during the progress of an electric storm, the plaintiff's intestate, a small colored child between eleven and twelve years of age, was standing in the door of his house, when according to the statements of some of plaintiff's witnesses, a bolt of lightning came in contact with the trolley wire of the defendant at some distance from the house on the Money Point side thereof, ran along the wire to the point where the same had formerly been connected with the "light wire," down on the house to the door in which

plaintiff's intestate was standing, and so shocked her that death immediately ensued.

The declaration contains three counts. The first count, after alleging the facts as to the ownership and location of the trolley wire, trolley poles, etc., by the defendant, alleges that the defendant "maintained, operated and controlled a certain other wire, running from a certain one of its poles aforesaid, and from a certain one of its trolley wires aforesaid, to and on a certain house owned by the said Rufus Daily, and then and there used and occupied by him and by the intestate, where she had a right to be, which said wire had at one time been used for the purpose of conducting an electric current from the said defendant's trolley wire to a certain cluster of lights placed by the said defendant for its own use, benefit and purposes, on and upon the front of the house aforesaid." It further charges that the defendant "was negligent in failing to keep said wire ('light wire') properly insulated, grounded and protected, and in maintaining lightning arresters and other proper devices in that vicinity, so as to afford reasonable protection while in said house."

The second count, after the formal allegations, charges that the "light wire" had formerly been used by the defendant in order to conduct an electric current from the trolley wire to the cluster of lights on the plaintiff's house, and that it was the duty of the defendant, to remove the said "light wire" from the house within a reasonable time after the defendant ceased to use the lights, and then charges that defendant negligently permitted the wire to remain on the house for a long period of time after the defendant had ceased to use the lights, so that the bolt of lightning which killed decedent was communicated to the door of the house, where the decedent was, over the wire so negligently left attached thereto.

The third count does not charge that the lights had ceased to be used, but charges the defendant with negligence in failing to use reasonable and proper care in and about insulating

and maintaining the lights on plaintiff's house, and in properly connecting said lights with the wires charged with electricity.

The defendant pleaded the general issue, and at the trial, after all the evidence had been introduced, the plaintiff asked for and obtained four instruction to the jury, three (Nos. 1, 2 and 3) being given over the objection of the defendant; and the defendant asked for five instructions, two of which (Nos. 1 and 4) were given, and Nos. 2, 3 and 5 were refused; to which rulings of the court in granting plaintiff's instructions Nos. 1, 2 and 3, and in refusing defendant's instructions Nos. 2, 3 and 5, the defendant duly excepted.

In the petition for this writ of error, eleven assignments of error in the trial court's rulings are made.

Assignments Nos. 1 and 7 relate to the action of the court, first, in admitting evidence to show that while the "light wire" was not connected with the trolley wire, as charged in the declaration, nevertheless the space between them was such that lightning could jump from one to the other; and, secondly, in declining defendant's instruction No. 2, to the effect that if the jury believed from the evidence that the "light wire" on the plaintiff's house was not connected with the trolley wire of the defendant, the jury should find for the defendant.

It is earnestly contended by the learned counsel for the defendant, that as the declaration in each and every count distinctly alleged that the trolley wire was *connected* with the "light wire," the defendant was summoned to answer a case based upon the theory that it had negligently left upon the house of the plaintiff, and had negligently failed to properly insulate and protect, a certain "light wire" connecting the cluster of lights on the house with the trolley wire of the defendant; whereas, by the evidence objected to, the plaintiff was permitted to introduce proof of a different case, to-wit: that while the wire was not connected, as charged in the de-

claration, nevertheless it was possible for a lightning bolt to leap from the one wire to the other.

In overruling the objection of defendant to said evidence, the court said: "I will overrule the objection. I think that 'connection' could be construed in two ways, the physical and electrical connection, and it may be that it was charged by the guy-wire, or in such way as to be connected in that way. I think also, under section 3384 (Code) it would be perfectly permissible to allow you (plaintiff's counsel) to amend even at this stage." This statement is quoted merely for the purpose of indicating the ground upon which the court admitted the evidence objected to. The point made in the remarks of the learned judge is, as counsel for defendant suggests, that the word "connection" may be construed to denote such a degree of proximity between two conductors, such as wires, that lightning will jump from one to the other.

It is very true that a defendant cannot be summoned to answer one case, and at the trial be obliged to meet another and an entirely different case, but we do not think that this rule applies here, for the reason that defendant was summoned to answer the charge that it had for some months prior to a certain date negligently permitted a dangerous condition to exist, in that it had neglected to maintain and keep in a reasonably safe condition an electrical wire connection between its trolley wire and the house of the plaintiff, installed for the defendant's own use, and that this negligence was the sole cause of a bolt of lightning passing from the trolley wire of the defendant over the "light wire" it had installed, to and upon the house of the plaintiff, causing the death of his decedent. It would, as it appears to us, be extremely technical to hold that with these facts averred in the declaration, evidence was inadmissible to show that the condition of the premises stated in the declaration existed, and that from it it was reasonably to have been expected by the defendant that lightning would, in an electrical storm, pass from the trolley wire

to the "light wire," the end of which was hanging a few inches below the trolley wire; that the defendant knew, or should be held to have known, that this light wire was disconnected, as indicated, near the trolley wire, and also near the ground at plaintiff's house.

In *Lynchburg Tel. Co. v. Booker*, 103 Va. 504, 50 S. E. 148, the declaration averred that the plaintiff was in a certain street of the city when injured by an electric wire of the defendant, but made no averment of the precise position of the wire which inflicted the injury, and the evidence showed that he was injured by a wire hanging down through a tree into a yard adjacent to, but not in, that street, and it plainly appeared that if not in the street the wire was in such close proximity to it as to have inflicted the injury on the plaintiff who was in the street: *Held*, that there was no variance between the allegation and proof.

We are of opinion that there is no merit in the assignments of error Nos. 1 and 7.

The trial court admitted evidence introduced to show that the defendant was negligent in not installing and maintaining a lightning arrester at or near the plaintiff's house, a lightning arrester being a device consisting of two wires, one extending down from the overhead wire, and the other running from the ground up, these two being separated only by a small gap which is sufficient to prevent the passage of the ordinary current of electricity from the overhead wire, but over which lightning can easily jump, and which gap is necessary, for otherwise all the current would flow from the overhead wire to and into the ground. The defendant excepted to the ruling of the court admitting this and other evidence with respect to the duty of the defendant to install and maintain a lightning arrester at or near the plaintiff's house. It also excepted to the granting of plaintiff's instruction No. 3, based upon this evidence, and to the refusal to grant defendant's instruction No. 3, which told the jury that there was no evidence in the

case that the defendant was guilty of negligence in respect to its use or non-use of lightning arresters. These rulings of the court are assigned as error, and will be considered together.

Plaintiff's witness, R. R. Grant, examined as an expert, was asked: "Was there room along the wire there, or any place where a lightning arrester, or diverter, could have been placed, that would have rendered it safe against lightning?" Ans. "A lightning arrester could have been placed on the next pole, which would have had some effect, and probably would have relieved the charge before it would have gone over the wire." In reply to the defendant's objection to this evidence, the plaintiff's counsel stated that they would connect the evidence with evidence to show that a lightning arrester should have been installed at the place, but this was not done, therefore, defendant moved the court to strike out the evidence that had been admitted with regard to the use of a lightning arrester, which motion was overruled; whereupon, the witness, Grant, was recalled and asked this question: "Is, or is it not, the practice of electric lighting companies, under similar circumstances, to place a lightning arrester or some such device on such a wire of an overhead circuit of that kind?" To which question the witness replied: "Let me understand the question. Was it that it is good practice to do it?" Q. "Do companies usually do that?" A. "I can't say they customarily do it. Those lights are put up by men, just wire men, sent out on the line to put up lights, and it is very seldom that they put any more lightning arresters than are originally put on the line. They put the lights up at different points without paying attention to them. It would be good practice to do it." Q. "Simply state, as a matter of fact, do the electric companies customarily attach to each wire of an overhead electric circuit, where it is connected with the property of other people, do they connect them with lightning arresters?" A. "Under ordinary circumstances, taking the companies at different places,

they don't follow hardly any practice at all; they put them up
in a harum-scarum way. They send a man out to put up a light
without reference to that. That is the common practice."
After the witness had given a number of answers going to
show that he could not state the custom of others engaged in
like business to that of the defendant with respect to light-
ning arresters, and that witness was speaking in the present
light in electrical matters, and not as to a custom among other
companies using electricity as a motive power for moving
street cars, all of which answers the court struck out, the wit-
ness was examined by the court as follows: "I will ask you
what is the custom of lighting companies, in matters of this
kind, with reference to lightning arresters?" A. "As I stated
before, the lightning arresters are placed on the line when the
line is installed by the engineer designing the system, placed
at the points, at the time, that he considers best." Q. "Have
you examined the line?" A. "The end here around this house."
Q. "You don't know how many lightning arresters there
are on the line of the road?" A. "No, sir." Q. "Would it
have been reasonably safe to have had a lightning arrester at
this particular point?" A. "This wire running to the house
was a hazard. It would have been some relief from the
hazard, giving another ground wire for the lightning to neu-
tralize." This evidence the court refused to strike out, al-
though the witness, in effect, but stated what he had stated
before, and what the court had stricken out.

The witness, Grant, and also witness, Palmer, the general
superintendent of the defendant, testified that it is the prac-
tice of trolley companies, during an electric storm, to turn on
all the light circuits in the cars, which, in effect, by making a
continuous circuit from the overhead wire to the ground, con-
verts every car on the system into a lightning arrester. The
witness, Palmer, also testified, and is not contradicted, that
from two to five lightning arresters were usually installed per
mile; that there was no general practice as to the intervals at

which such arresters were placed in suburban districts; that it was not the practice to install a lightning arrester at every point where there was any connection with overhead wires; and that he (Palmer) did not know any electrical company in the world that did so. According to defendant's witness, E. E. Holland, there was one lightning arrester distant one thousand feet from the plaintiff's house, in one direction, and another distant some seven hundred feet in the other direction. The correctness of this statement is not questioned.

It will be observed that the witness, Grant, does not show any practice or custom on the part of companies engaged in similar business as to installing lightning arresters at such points as the one here in question, but merely expresses an opinion that a lightning arrester at this particular point would have been "some relief from the hazard," no foundation having been laid to support the theory that there was a duty upon the defendant to maintain a lightning arrester at that point. Without any reference to the question, whether or not as a matter of proper construction, with the conditions existing before this accident, the defendant should have installed a lightning arrester at this point, the witness was allowed to look at the situation after the event and say, that a lightning arrester at the point of the accident would have constituted "some relief from the hazard." He does testify as to looseness or carelessness of other electric companies with respect to the installation and maintenance of lightning arresters, but loose or careless practices of other companies in this respect cannot be taken as a standard by which to determine whether or not a company engaged in a similar business has been negligent with respect to the installation and maintenance of proper lightning arresters or other devices to prevent injury to persons or property.

"Courts cannot dictate to railway companies a choice between methods, all of which are shown to be reasonably adequate for the purposes intended to be subserved. Thus to subject them

to the varying and uncertain opinions of juries in questions of policy, and substitute the discretion of the latter for their discretion, would be wholly impracticable, and would prove alike disastrous to the companies and to the public." *Norfolk & Western Ry. Co.* v. *Cromer*, 101 Va. 667, 44 S. E. 898.

In *Norfolk, &c. Co.* v. *Ellington's Admr.*, 108 Va. 245, 61 S. E. 779, a witness was asked what would be a simple, inexpensive device which could be used at a cross-over between two street car tracks, which would be promotive of safety to the employees of the railroad in conducting cars from one to the other track, to which question the witness answered: "A cross-over trolley wire would be a simple inexpensive device for promoting the safety and convenience of the company and its employees." There was a verdict and judgment in that case for the plaintiff, which on a writ of error came under the review of this court, and in view of the fact that there was no evidence in the case that it was the general practice or custom of companies engaged in like business to use such cross-over trolley wires as were spoken of in the question and answer referred to, this court held, not only that it was error to permit the question to be answered, but that the court should have affirmatively instructed the jury that there was no evidence to support the count in the declaration which averred negligence in respect of the non-use of such cross-over trolley wire. In the opinion by Whittle, J., it is said that the "unbending test" of negligence is to be found in the ordinary usage of the business, and that no man is to be held by law to a higher degree of skill than the fair average of his profession or trade, and the standard of due care is the conduct of the average prudent man.

But say counsel for plaintiff in this case, the line of cases to which *Norfolk, &c., Co.* v. *Ellington's Admr.*, *supra*, belongs, is essentially different from the case at bar, in that they were cases of master and servant, where the only care required to be exercised by the master was ordinary care. In the cases

cited by counsel for plaintiff we are unable to find any departure from the rule, that the care required in this and like cases is ordinary care. While ordinary care may, in some cases, involve the exercise of greater skill than in others, as was said in *Norfolk Ry. & L. Co.* v. *Spratley*, 103 Va. 380, 49 S. E. 502, cited for the plaintiff in this case, all that is meant in that case is that the electrical business being a dangerous one, requires a high degree of technical care and skill in the matter of operation; and it is so held in numerous railroad cases where the business is likewise considered to be an extra hazardous one  Still the measure of care to be exercised is none the less that which is spoken of always as "ordinary care," the test of which is the practices or customs of others. engaged in a like business.  This view is not questioned by the cases cited for the plaintiff; on the contrary, they sustain the view, as will appear from a reference to a few of them.

In *Southern, &c. Co.* v. *Robinson*, 1 C. C. A. 684, 50 Fed. 810, 16 L. R. A. 545, negligence is described as " * * * * failure to do what a reasonably prudent person would have done under all the circumstances of the situation, or doing what such a person under the existing circumstances would not have done."

In *Griffith* v. *New Eng., &c. Co.*, 72 Vt. 441, 48 Atl. 643, 52 L. R. A. 919, speaking of the duty of a telephone company, the court said that having undertaken to place a telephone instrument in a house, "It was under a duty to exercise the care of a prudent man under like circumstances."

The Supreme Court of Alabama, in *Southern, &c. Co.* v. *McTyer*, 137 Ala. 601, 34 So. 1020, 97 Am. St. Rep. 62, defines the duty of a telephone company as follows: "If by the exercise of such reasonable precautions as a man of ordinary care and prudence would exercise in respect of such dangerous agents, injuries to persons and property from the conduction along the wires and into houses of currents of atmospheric electricity may be avoided, it is the duty of companies en-

gaged in this business to employ devices and appliances to that end." There the court plainly lays down the rule requiring only "ordinary care."

The case at bar was tried on that theory, for the court, at the request of the plaintiff, instructed the jury that the defendant was not required to guarantee the safety of the wire run to plaintiff's house, but "was required to exercise that due and ordinary care which the present state of scientific knowledge, as well as the common observation of the nature of electricity, and the enormous power of lightning would suggest as reasonably necessary for the protection of life along its line and wires."

It must, therefore, be conceded in this case, that the measure of care required of the defendant was ordinary care with respect to its duty to install and maintain lightning arresters along its line of railway; and this is in accordance with the rule adopted by this court of long standing. See *Bertha Zinc Co.* v. *Martin*, 93 Va. 791, 23 S. E. 869, 70 L. R. A. 999, citing among others the case of *Titus* v. *Railroad Co.*, 136 Penn. St. 618, 20 Atl. 517, 20 Am. St. Rep. 944, in which the court said: "No man is held by law to a higher degree of skill than the average of his profession or trade, and the standard of due care is the conduct of the average prudent man;" and having laid down this general test of ordinary care, the opinion further says: "The test of negligence in employers is the same," meaning, necessarily, that the test of ordinary care was the same in master and servant cases as in any other negligence cases, except, of course, the cases of a passenger or stranger seeking a recovery of damages for a personal injury caused by the negligence of a carrier under circumstances requiring the use of great or extreme care on the part of the carrier.

We are of opinion that the circuit court erred in admitting the evidence objected to by the defendant, introduced to show negligence on its part in not installing and maintaining

a lightning arrester at or near the house of the plaintiff; and in granting plaintiff's instruction No. 3, based on said evidence; and also erred in refusing defendant's instruction No. 3.

We have set out the averments of the second count of the declaration, and the charge of negligence therein made. There was evidence tending to prove that the "light wire" left on the plaintiff's house for some months was in a dangerous condition; that the defendant was repeatedly informed of the condition of this wire, and requested to restore the lights, which, if done, would have restored the electrical circuit as it was until the "light wire" became disconnected from the trolley wire and broken near the ground at the house, so that lightning passing from the trolley wire to and along the "light wire" could not pass into the ground. In view of the averments of the second count of the declaration and this evidence, defendant's instruction No. 5, telling the jury that they should disregard the second count of the declaration, was properly refused.

The witness, Grant, was asked the following question and made the following answer, over the objection of the defendant: Q. "Is it in your opinion a safe method, where a company uses electricity for lights, has ceased to operate its wire, and disconnects such wire for a few inches, to leave the wire still upon a house, lower than the point where it crosses, near the wire where it has been connected, and still attached to the house?" Ans. "I don't consider that a dead wire connected or close to the live wire or trolley, left dead and connected to the house, to be safe."

The ground of objection to this evidence is that it was not competent for the witness to testify whether or not the method was safe, but the witness should have been required to testify as to whether or not the method used was the method commonly employed by companies engaged in a similar business.

The witness had been asked as to the custom among electric light companies when, for any reason, the wire used for lighting purposes had ceased to be used, i. e., was the wire, under the circumstances stated, removed or not? To this question no answer was made; whereupon, the question above set out was propounded, which sought and brought from the witness an opinion that the condition of the "light wire" on plaintiff's house was not safe; and this too, notwithstanding no evidence had been introduced showing the custom among companies engaged in a similar business to that of the defendant as to the removal of such wires. In other words, without any test as to the duty of the defendant with respect to the removal of the "light wire" from the plaintiff's house after it had ceased to be used and had become disconnected from the trolley wire, the witness, Grant, was permitted to give merely his opinion that the wire, as left upon the house, was not safe. This was error. *Norfolk, &c., Co. v. Ellington's Admr., supra.*

Plaintiff's instruction No. 1, general in terms, was not prejudicial to the defendant, therefore it was not error to give it. Nor did the court err in giving plaintiff's instruction No. 2.

This brings us to the two remaining assignments of error, the one relating to the action of the court in declining to set aside the verdict of the jury on the ground that the damages allowed were excessive; and the other relating to the refusal of the court to set aside the verdict because contrary to the law and the evidence.

As the case has to be remanded because of the errors already pointed out, it is not necessary to consider the two last-named questions, which may not arise on another trial.

The judgment complained of must be reversed, the verdict of the jury set aside, and the cause remanded for a new trial.

*Reversed.*