𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫.

JEFFRESS V. VIRGINIA RAILWAY AND POWER COMPANY.

September 16, 1920.

1. APPEAL AND ERROR—*Assignment of Error—Substantial Compliance With Statute.*—Section 3464 of the Code of 1904, section 6346, Code of 1919, provides that a petition for an appeal, writ of error, or supersedeas shall assign errors. The petition in the instant case did not in specific terms comply with the section, but it contained a very clear and comprehensive discussion of the various rulings of the court upon the admission and exclusion of evidence, the granting and refusing of instructions, and a motion to set aside the verdict and grant a new trial. These rulings were shown and challenged by separate bills of exceptions appearing in the record and specifically referred to in the petition.

   *Held:* That the petition substantially complied with the statute, and a motion for dismissal was accordingly denied.

2. ELECTRICITY—*Care Required—Instructions—Case at Bar.*—In an action against an electric light company for loss of a house by fire, alleged to have originated from an excessive electric current in the house, due to want of a ground wire or the restoration of the fuse where the primary circuit entered a defective transformer, the instructions asked for by the plaintiff would have distinctly informed the jury that "the law regards electricity as a dangerous agency," and that it was the defendant's duty to exercise "a higher degree of care than is required in the ordinary affairs of life"—a care "commensurate with the danger." These instructions were refused and those given simply told the jury that the defendant's duty was to exercise "ordinary care, having regard to the nature of electricity, and consistent with the practical conduct of its business," without any addition or qualification specifically explaining that "ordinary care" must always be determined by the known dangers involved.

   *Held:* Prejudicial error.

3. NEGLIGENCE—*Ordinary Care—Dangerous Instrumentalities.*—Persons dealing with dangerous instrumentalities are chargeable

with a "high degree" of care, and there is great propriety in telling a jury that the degree of care required in such cases is higher than in transactions involving little danger. It is just as accurate to say that there are different degrees of ordinary care as to say that there are different degrees of danger. The difference may be well described as one "in degree and not in kind." The legal classification or kind of care is ordinary, but the degree is extraordinary, because the danger is extraordinary. Care must always be in proportion to the danger.

4. ELECTRICITY—*Care Required—Instructions.*—In an action for injuries caused by electricity, the plaintiff has the right to have the court tell the jury in so many words that the danger of the situation was to be specifically considered by them in determining the measure of the defendant's care. The question is one of too much public importance, affects too many lives and too much property, and the opportunity and ability to know and guard against the danger are too clearly and peculiarly with the persons producing and furnishing electricity, to admit of any mincing of words in laying down the rule of duty which should regulate the business.

5. INSTRUCTIONS—*Presenting View of Each Party to Jury.*—Each party has the right to have presented to the jury its contention upon vital points in language to be chosen by it, provided such language is in keeping with the law.

6. ELECTRICITY—*Care Required.*—Persons engaged in the development and distribution of electricity are charged with the duty of exercising a high degree of care—a care commensurate with the danger of the instrumentality—and if their failure to exercise such care results in injury to persons or property, a legal liability follows.

7. NEGLIGENCE—*Ordinary Care—Burden of Proof.*—He who charges a lack of ordinary care must prove it.

8. ELECTRICITY—*Care Required—Admission of Evidence——Common Usage—Case at Bar.*—In the instant case the plaintiff offered proof which, if the court had allowed its introduction, would have tended to prove, and might have convinced the jury that the test used upon a transformer was not merely inadequate, but inappropriate, and of no use at all for the purpose of discovering whether a red glow in the lamps in the house after a storm was due to a dangerous defect in the transformer. The linemen who made the test had not been informed (although the company knew) that the lights in the house had been burning dimly, indicating that the transformer might have been damaged, after the lights had suddenly gone out

in the storm. This proof the court refused to admit on the ground that the sole test of ordinary care in such a case was the common usage and practice of other like companies or persons engaged in a similar business, supplying a similar service under substantially similar conditions, using the words "common usage and practice" to mean "a fair average of such other companies engaged in a like business under similar conditions for similar service."

*Held:* Prejudicial error. Custom and usage while admissible to show ordinary care is not conclusive.

9. ELECTRIC LIGHT COMPANIES—*Ordinary Care—Employes and Strangers.*—Ordinary care requires a higher degree of diligence on the part of electric light companies towards outsiders than they owe to their employes. As to the former, they must, in the exercise of ordinary care, use the best mechanical contrivances and inventions in known practical use; as to the latter, ordinary care does not require them to furnish the best, but only those which are reasonably safe and fit.

10. ELECTRICITY—*Care Required.*—Persons engaged in the development and distribution of electricity owe to their employes the duty of exercising ordinary care to furnish them reasonably safe surroundings, materials, and appliances; and to their customers and all others, who for business or pleasure have the right to be in reach of the current, the duty of exercising ordinary care to avail themselves of the best materials, and the best mechanical contrivances and inventions which are in practical use, to prevent personal or property injuries to such customers and such other persons.

11. ELECTRICITY—*Ordinary Care.*—Ordinary care by persons engaged in the development and distribution of electricity, whether affecting employes or strangers, demands a higher degree of diligence and foresight than is required in affairs involving less hazard, and must be graduated and measured by the danger.

12. NEGLIGENCE—*Ordinary Care—Evidence of General Usage.*—The general usage of the business in a given situation is admissible as evidence of what is reasonable and proper to be done in that situation, from which, along with the other (if there be other) pertinent facts and circumstances of the case, the jury are to determine the question of negligence. If there be no conflict of evidence as to the existence of the general usage, and nothing in the evidence tending to show, as to employes, that the usage was not reasonably safe or adequate for its purpose and occasion, and nothing, as to strangers, tending to show that the usage did not afford as high protection as

would result from any other known and practical methods of the business, then the usage itself is conclusive evidence of the exercise of ordinary care, and no verdict to the contrary should be upheld.

13. APPEAL AND ERROR—*Error Must be Prejudicial—Answer Expected of Witness.*—Any error complained of must appear to have been prejudicial, and it is, therefore, ordinarily true that when a witness is asked a question to which an objection is sustained, if the record does not show by necessary implication, or by a statement of the witness, or by an avowal of counsel, what answer was expected, the exception cannot be availed of in the appellate court, because that court cannot tell whether the answer would have been favorable or unfavorable to the party excepting.

14. APPEAL AND ERROR—*Exclusion of Evidence—What Evidence Expected to Prove.*—Fairness to the lower court and the due and proper administration of justice demand that the trial judge himself should know before the case goes to the jury what the party excepting to his ruling expected to prove by the evidence excluded.

15. APPEAL AND ERROR—*Exclusion of Evidence—What Evidence Expected to Prove—Case at Bar.*—In the instant case it was contended that the Supreme Court of Appeals could not consider the exceptions to the rulings of the court upon the admission of evidence, because the record did not show what the answers of the witnesses on the question at issue would have been. But as there was no ground to imagine that the trial court had the least doubt as to what these witnesses were expected to show, and would not have ruled just as it did if express avowals had been made at the trial, the contention was without merit.

16. FIRES—*Measure of Damages—Case at Bar.*—In an action for destruction of a house by fire and damage to shade trees and shrubbery, and the destruction of certain personal property, plaintiff undertook to fix the amount of such damages by showing the original cost and the probable cost of replacement. This method of proof was practically unchallenged by the defendant except that on cross-examination the plaintiff's witnesses were asked a number of questions as to the market value of some of the property. No market value was shown. Plaintiff asked for an instruction that if the jury should find for him they should allow him damages equal in the value of such property as was destroyed and to the damages done to such as was injured.

*Held:* That this instruction, with the additional statement that the value was to be fixed at the time of the fire, should have been given.

88

17. FIRES—*Measure of Damages—Case at Bar.*—It is probable that no market value could have been shown for any of the property. Dwelling houses and shade trees apart from the land, and partly used or damaged personal property, although susceptible of valuation, are not usual articles of trade. If, however, as a technical proposition, the market value is to be taken as the correct basis for the measure of damages, the failure of the defendant to object to the plaintiff's method of proof, or to offer countervailing evidence, placed the latter in a position to ask for a verdict upon the proof of value introduced.

Error to a judgment of the Hustings Court, Part II, of city of Richmond, in an action of trespass on the case. Judgment for defendant. Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*Miller & Miller* and *C. V. Meredith,* for the plaintiff in error.

*H. W. Anderson* and *E. R. Williams,* for the defendant in error.

KELLY, P., delivered the opinion of the court.

Thos. F. Jeffress owned a costly and valuable residence which was destroyed by fire. Claiming that the fire was due to an excessive current of electricity negligently allowed to pass into the house from the wires of the Virginia Railway and Power Company, he brought this action against that company to recover damages for the loss. There was a verdict and judgment below for the defendant, and the case is here upon a writ of error.

[1] Counsel for the defendant moved in this court for

a dismissal of the writ, upon the ground that the petition fails to comply with section 3464 of the Code of 1904, section 6346 Code of 1919, which provides that "a petition for an appeal, writ of error or supersedeas shall assign errors." The petition in this case does not in specific terms comply with this section. It does, however, contain a very clear and comprehensive discussion of the various rulings of the court upon the admission and exclusion of evidence, the granting and refusing of instructions, and the motion to set aside the verdict and grant a new trial. These rulings are shown and challenged by separate bills of exceptions appearing in the record and specifically referred to in the petition. Under these circumstances we hold that the petition substantially complies with the statute, and the motion is accordingly denied.

Coming now to a discussion of the case upon its merits, it will be necessary to state at some length the facts out of which the action arose.

The Jeffress residence was situated in Chesterfield county about eight miles from Richmond. When it was built in 1894 there was installed in the basement a gas machine for the purpose of lighting the house, and gas pipes were connected with this machine extending through the walls of the building to the lighting fixtures. Later on, in 1907, the plaintiff, Jeffress, through a competent contractor, equipped the house for electric lights. The layout adopted by the contractor for this purpose provided for the entrance of electricity into the house on the third story at the cornice, where there was a main or master switch to control the current and throw it on or off the house as desired. From this point of entrance the wires were run in a solid steel tube a distance of about fifteen feet to a panel board located in the hall on the second floor. At this panel board there was another switch, and from that point the current of electricity was distributed throughout the house, the wires ex-

tending therefrom in flexible tubes to the various lighting fixtures. Some of these fixtures were designed for electric lights alone, while others were known as combination fixtures containing electric light globes and gas jets. To reach a combination fixture the electric wire was run along the gas pipe to the fixture, and the pipe and the wire were both enclosed in a brass tube. Where no gas fixtures were retained, the gas pipes formerly extending to that lighting point were not taken out, but were left in their former position connected with the gas plant, and were stopped up with a cap on the end. The conduits in which the electric wires were carried were grounded by attaching wires to the outside of the tubes and then to the water pipes in the house which extended to the earth; and the system inside of the house was further protected by fuses at both the outside and inside switches which were designed to blow and thereby stop the flow of current in case of an overload upon the wires.

In 1910 Mr. Jeffress, Mr. J. Scott Parrish, owning a residence about a quarter of a mile east, and Mr. Theo. A. Page, owning a residence about a quarter of a mile west of the Jeffress house, severally contracted with the defendant company to furnish electricity from its plant in the city of Richmond for their respective residences. The contract provided that the plaintiff was to equip his house with the necessary wiring, lamps, appliances, fixtures and other electrical equipment, and the company was to furnish the meter and service-appliances necessary to a connection with the main wires. Under the terms of the contract the current was sold and delivered by the company at the meter, which at the outset of the arrangement was placed where the electric wires entered the house, but later at a pumphouse outside of but near the residence. The company reserved the right not to supply current until the house equipment should be approved by "the constituted authorities and the com-

pany's inspector," and furthermore, the plaintiff was required to make all repairs to his equipment and maintain it in the condition required by the company. It also stipulated for the right of access to the premises at all reasonable times during the continuance of the agreement to read meters, inspect its property, and for any other purpose under the agreement, and to discontinue the service upon the plaintiff's failure to comply with the conditions in the contract. There was an endorsement upon the contract in these words, "Accepted and connected the 20th day of May, 1910," from which it appears that the company was satisfied with the inside equipment, and connected the current accordingly. From that time until the date of the fire the company continued to furnish the current according to the terms of the written contract above mentioned, which, although the period of time therein provided for had expired, was tacitly understood between the parties as remaining in force. No complaint was ever made by the defendant as to the inside equipment and appliances installed and maintained by the plaintiff.

The method or plan under which the electric current was delivered by the company to the plaintiff was this: The company had a plant in the city of Richmond where it developed the electricity and transmitted it thence over wires extending first to the house of Mr. Parrish, then to the house of Mr. Jeffress, and then to the house owned by Mr. Page. This line, called the main or primary circuit, was carried to the premises of the plaintiff, after having passed the house of Mr. Parrish, and was connected on the plaintiff's premises with a transformer, which was placed about thirty feet from the ground on a chestnut pole. The primary line carried 2,300 volts of electricity, a current altogether too heavy for use in a residence, and dangerous to both life and property. The purpose of the transformer was to convert or transform this current into one of less voltage (250

volts) and adapt it to use for light and power purposes. This reduced or transformed current, called the secondary circuit, extended from the transformer to the plaintiff's house and back again to the transformer on wires provided for that purpose.

On each of the two wires of the primary circuit near the transformer was a fuse designed to blow in case of an overload of electricity by lightning or other cause, and the chief purpose of this device was to protect the transformer and thereby protect the premises beyond. On the secondary circuit near the transformer were other fuses intended for a like purpose. In addition to these precautions, the line was properly equipped with lightning arrestors at appropriate distances on opposite sides of the transformer.

It affirmatively appears in the evidence, and, with one exception, is in no way contradicted, that the method of construction adopted by the company for the purpose of conveying and delivering the current to the premises of the plaintiff was in accord with the usage and practice of standard companies all over the country engaged in similar business. Nor, with the one exception, was there any evidence tending to show this method was inherently improper or unsafe in any particular.

There was, however, a conflict in the testimony as to whether there should have been a wire extending to the ground from the neutral at the point where the secondary current left the transformer. The evidence tended to show the absence of such a wire. According to some of the witnesses the employment of a ground wire was in accord with the general usage of the business. Other witnesses testified to the contrary. Furthermore, there was a conflict of evidence as to whether as a fact, regardless of the question of usage, the grounding of the neutral at the transformer would have provided a reasonably adequate protection against the danger of fire in the premises in case

the transformer became damaged and inefficient; and, further, as to whether, if a ground wire would otherwise have been required, the grounding of the wires in the house, answered the same purpose.

It should be further added that all of the testimony shows that so long as a transformer remains in normal condition, it will not permit an excessive or dangerous current to be transmitted from the primary to the secondary circuit, and that if a fuse is blown on the primary side of a normal transformer no current will flow into the secondary circuit.

On the afternoon of August 29, 1913, Mr. Jeffress, his son, Robert Jeffress, and a friend, Mr. Miller, left the city of Richmond in an automobile and started for the Jeffress residence. They arrived in a heavy rainstorm between five and six o'clock. When they entered the house it was very dark because of the storm, and they turned on the electric lights, which burned normally. Shortly thereafter, following a vivid flash of lightning, the lights instantly went out. Mr. Jeffress and his son found some candles and then proceeded to the basement where they wound up the gas machine (which ordinarily was not used), forced the gas into the pipes, and lit some of the gas jets. They remained at the house until the storm subsided and went to the nearby residence of Mr. Exall to get their supper. Mrs. Jeffress and the other members of the household had been absent for sometime, and there had been no fire and no light, except the electric light, in the house for several weeks. The Messrs. Jeffress and Mr. Miller returned from their supper between eight and nine o'clock, and on their return they discovered that the electric lights, which had been burning and had suddenly gone with the flash of lightning, were burning dimly with a dull red glow. Just before starting for supper Mr. Jeffress had called up the electric light plant in Richmond and reported the fact that the lights were out, and got the reply that the company would try to send a

man out that night and fix them. It developed afterwards that the company had a great deal of line trouble that night and did not have time to reach Mr. Jeffress' home before the next morning. On discovering the dim or dull red glow in the lamps on their return from supper, young Mr. Jeffress again called the plant and reported the condition. He was told to turn off all the lamps but one, and see if that made any difference. He tried this experiment and reported over the telephone that he could see no difference. There is a conflict in the testimony as to what transpired at this particular juncture. Mr. Jeffress states that when he informed the man at the plant of this condition, he asked him if it was safe to let it go until morning, and was assured that it was safe, and that the company would send a man out the next morning. The gentleman to whom he talked at the plant denies this, and says he told young Mr. Jeffress to go to the switch and cut the current off from the house. However this may be, young Jeffress says that he was uneasy anyhow, and notwithstanding the assurance he got from the plant, he decided himself to cut off the lights and attempted to do so, and thought he had done so. Whether he did or not seems to be rather difficult to determine. Nobody claims to have seen any more light in the house that night or the next morning before the linemen came to repair the damage, and yet after they had done their work, the lights came on and nobody seems to have touched the switch in the house that morning.

On the morning of the 30th of August Mr. Jeffress and his son and guest left the residence, got their breakfast at Mr. Exall's home, and went back to the city. Mr. Jeffress, however, left instructions with his farm manager, a man named Hutcheon, who lived on the place, to tell the linemen when they repaired the line outside to go in the house and see if everything was all right. Hutcheon testified that he delivered this message.

Shortly after Mr. Jeffress and his party had gone to the city, two linemen, Maitland and Crowder, came out over the line to inspect and repair it. They first reached the residence of Mr. Parrish, which, as we have seen, was served with electric current under the same general conditions as those prevailing at the Jeffress residence. At the Parrish place the linemen found that a fuse on the primary at the transformer had blown. They restored the fuse and then resorted to a test on the secondary circuit which we shall presently describe, and which was subsequently applied on the secondary circuit at the Jeffress residence. The purpose of this test, according to the testimony of Maitland, who made it, and of other experts testifying on the subject for the defendant, was to determine whether the current was normal on the secondary circuit, and also whether there had been any damage to the transformer which affected its normal operation. It does not appear, however, that there had been any dim red glow or any electricity at all in the Parrish house after the storm. This test proving satisfactory at the Parrish place, the linemen then proceeded to the Jeffress residence. Here also they found that one of the fuses on the primary line had blown. They restored the fuse in the usual and proper way, and then resorted to the same test which Maitland had made at the Parrish place. That test, as described by him, was as follows: "I came down the pole and went into the pump house where the main line was (referring to the main line of the secondary circuit), and I had a 235 volt lamp and I tested from the neutral to the one outside and from the neutral to the other outside, and I tested across the face and it seemed to get the regular light across the face and the normal light from the neutral to the outside." Experts of wide and long experience testified that this was an adequate test and was in common use by other companies engaged in similar business. Others of perhaps equal experience testified that

89

there were other tests which were well known and were simple and safe and effective, but none of them were able to directly contradict the statement of the other experts as to the common practice of other companies in this regard, nor could any of them state positively and of their own personal knowledge that the other tests to which they referred were in common use. They were experienced and learned electricians, however, and were prepared to state that, from their personal knowledge, aided by information derived from other electricians and from the literature of the craft, the test used by Maitland was inadequate and that tests they recommended were efficient for the purpose, and were in practical, if not in common, use by other companies. An analysis of the defendant's evidence on this subject shows that, although its witnesses were quite direct and positive in saying that the test used by the lineman was usual and customary, their information must have been derived from the same sources as those relied upon by the opposing witnesses.

According to the testimony of Hutcheon, he told the linemen before they left the Jeffress premises that Mr. Jeffress wanted them to go to the house and see that things were right inside, and they told him to go in the house while they were gone and try the lights and see if they burned all right, and they would see him on their way back. Maitland denies this statement (Crowder did not testify), but says that Hutcheon himself said he would go in the house and look at the lights and see the linemen as they returned. At any rate, Hutcheon did go in the house and the linemen went on to the Page residence. Without touching either of the controlling switches in the house, Hutcheon turned on one of the lights in the kitchen, and found that it seemed to be burning normally. While inside he did not discover any smell of gas or smoke, and though it is in evidence that he himself smoked a good deal, he testifies

that he was not smoking on that occasion. The linemen found the same outside conditions at the Page house which they had found at the Parrish and Jeffress houses. Just about the time they started back, they and others in the community discovered that smoke was coming from the Jeffress house. It was soon enveloped in flames, and was completely destroyed by fire in a very short time, resulting in a total loss of the residence and very great damage to the lawn, trees, shrubbery and outbuildings. No fire occurred at either the Parrish or Page houses, but it does not appear that at either of these houses there was any indication that the current was in some way continuing to flow in the secondary circuit after the transformer fuses had blown.

It is shown in the evidence that when Maitland and Crowder were sent out they were not informed of the fact, reported to the company the night before, that some current was in some unexplained way going into the Jeffress house after the lights had first gone out and remained out for an hour or two, nor were they given any reason to suppose that conditions in the Jeffress house had been different from the conditions which ordinarily follow when the lights suddenly go out in an electric storm. If the test they used was in fact appropriate and adequate for the occasion, they were using it without knowledge of apparently the most material facts calling for a test.

It further appears that the most probable and usual explanations for a dull red glow in electric lights such as showed itself in this case, are first, that a primary line has broken down somewhere; or second, that the plant is not delivering a normal amount of current; or third, that the transformer itself has been damaged by reason of the electric storm so that the wires therein have come into physical contact. There was no evidence of the existence of either the first or second causes mentioned. While the evi-

dence was in conflict as to the third, there was direct testimony to show the transformer might have been so damaged by the lightning at the time the primary fuse was blown as to bring the primary and secondary coils in physical contact, and thus account for the dull red glow in the lamps, and further, that if the primary and secondary fuses were restored with the transformer in this condition, the result would be to turn practically all of the primary current into the residence, thereby subjecting the occupants of the house to danger of fatal electric shock, and the house itself to the danger of destruction by fire. And it further appears from the evidence that after the fire, but on the same day, the transformer was tested by representatives of the company under another and different test from that which was used by the linemen, and found to have the primary and secondary coils crossed in such manner as not to afford any protection against the passage of the primary current into the secondary circuit.

[2] The plaintiff contends that this transformer was damaged the night before by the lightning, thereby causing the conditions in the house above described which probably would have been prevented by a ground wire, that in any event the agents of the company, after these conditions were brought to their attention ought to have known what the trouble probably was, and that they negligently failed to take proper steps to remedy it, and that such negligence was the proximate cause of the fire.

The contention of the defendant on the other hand is that it made due inspection and tests, that it was under no duty to provide a ground wire, that the transformer was probably injured from the secondary side during the fire, when there was very great electrical disturbance on the line due to the breaking down of the insulation in the house and the crossing of wires, etc., and that the fire probably started from defective wiring or escaping gas in the house,

·or from a match or cigarette dropped by Hutcheon when he entered the house to try the lights that morning, or from some other cause for which the defendant was not responsible.

. From the foregoing statement, it is manifest that if the plaintiff could establish to the satisfaction of the jury by legal evidence that the transformer was injured by lightning on the evening of the 29th of August and that a ground wire ought to have been used and would have afforded protection, or that the conditions which were reported to the plant were such as to have reasonably charged the representatives of the company with notice of the damage to the transformer, and that the failure to discover the trouble the next morning was due to insufficient inspection or tests applied by the company's representatives, and lastly, that the fire originated from an excessive electric current in the house due to want of a ground wire or the restoration of the fuse where the primary circuit entered the defective transformer, then the plaintiff was entitled to a verdict. The fact that the jury did not find a verdict for him upon the evidence which we have adverted to shows that the plaintiff did not convince them of the correctness of his contention. We are bound by this verdict so far as the facts are concerned. If this case was fairly submitted to the jury upon the law as given by the court, and if there was no error in the admission or rejection of testimony, we cannot interfere with the judgment.

The case is one of more than ordinary interest and importance. The amount involved is large. The trial, occupying eight days, was had before a special jury and was presided over by a judge of experience and ability. The parties on both sides were represented by eminent counsel. Distinguished experts in the electrical business from far and near were called as witnesses and testified in much detail and at great length. The question of liability and

the rules by which it should be determined are of prime importance to the vast and indispensable enterprises all over the country engaged for their own profit in the manufacture and distribution of electricity, and to the millions of consumers who are daily enjoying the benefit and exposed to the risks involved in its use. The questions involved are not new—there is an ocean of authority upon them—and yet as related to this case, they cannot be said to have been clearly and definitely settled.

The evidence alone embraces 523 pages of the printed record. During the progress of the trial the plaintiff took forty-four bills of exceptions upon various rulings of the court. One of these was to the refusal of the motion to set aside the verdict and grant a new trial. Forty-two of the bills embodied exceptions to the rulings of the court upon the admissibility of the evidence. The remaining one related to the instructions given and refused. The plaintiff prepared and asked the court to give sixteen instructions. The defendant likewise asked for a number, but how many or just what they were the record does not show. It is readily apparent, however, that both sides asked for too many, unnecessarily burdening the trial court and neglecting the opportunity to aid the judge and jury by reducing to brief and simple form their respective contentions as to the law of the case.

The court, having heard the argument of counsel thereon, refused all of the instructions as offered, and in lieu thereof, gave fifteen of its own, seven of which were modifications of some of those asked for by the plaintiff, and eight of which were based upon those asked for by the defendant. The plaintiff excepted to the court's action in refusing his instructions as offered and in giving all of the others except one.

It thus appears that there were in fact seventy-three exceptions (thirty upon the instructions) presented in the

record and involved in this writ of error; and fifty-eight of these are discussed more or less fully in the petition and briefs.

Notwithstanding these numerous exceptions, we think the substantial differences between the parties as to the law of the case may be reduced to three questions: First, did the trial court properly instruct the jury as to the measure of the care which the defendant company ought to have exercised under the facts of the case? Second, did the court apply the proper rule of evidence for determining whether such care had been exercised? And, third, did the court correctly instruct the jury as to the measure of damages in case the plaintiff was entitled to recover?

1. The fundamental and radical difference between the instructions asked for by the plaintiff and those given by the court as to the measure of care is that the former would have distinctly informed the jury that "the law regards electricity as a dangerous agency," and that, it was the defendant's duty to exercise "a higher degree of care than is required in the ordinary affairs of life"—a care "commensurate with the danger"—whereas, the instructions actually given simply told them that the defendant's duty was to exercise "ordinary care, having regard to the nature of electricity, and consistent with the practical conduct of its business," without any addition or qualification specifically explaining that "ordinary care" must always be determined by the known dangers involved. This difference is wider and more important than might upon a casual view appear. It became a vital subject of contention at the trial, appears to have been a controlling consideration with the trial court, and has followed the case to this court as one of the most warmly contested points of debate between the parties. It was emphasized and conspicuously marked by a rigid line followed by the trial court throughout the instructions. Those given adhered to a studied

use and repetition of the expression "ordinary care," with no other qualifications except a "regard for the nature of electricity, consistent with the practical conduct" of the defendant's business; and the plaintiff was denied any instruction emphasizing in terms the danger of the situation as a proper element to be considered in determining whether the defendant had exercised the high measure of care which as a matter of law was clearly incumbent upon it.

[3] Speaking technically, "ordinary care" correctly expresses the legal idea of the defendant's duty, but in the practical embodiment of that idea in the instructions to the jury, the plaintiff had a legal right to some express qualification or explanation indicating that the care to be used was to be measured by the danger to be anticipated. To say that the defendant in this case had to exercise "a higher degree of care than is required in the ordinary affairs of life" is one very proper way of defining the defendant's duty. It is the common language of the authorities on the subject that persons dealing with dangerous instrumentalities are chargeable with "a high degree" of care, and there is great propriety in telling a jury that the degree of care required in such cases is higher than in transactions involving little danger. It is just as accurate to say that there are different degrees of ordinary care as to say that there are different degrees of danger. The difference may be well described as one "in degree and not in kind." The legal classification or kind of care is ordinary, but the degree is extraordinary because the danger is extraordinary. Care must always be in proportion to the danger.

It is conceded in the carefully selected language of the learned brief for the defendant that the "measure of care" is the question to be determined. We can conceive of no better or fairer way of answering the question than to say, in the very language of plaintiff's rejected instructions,

that the care must be "commensurate with the danger." Our own courts and many others have frequently expressed the idea in just these words, and counsel for the defendant admit that this is true, but they say the language is inaccurate, and insist that the word "commensurate" means "equal to," citing Webster's definition of the word as "equal in measure or extent," and from this they argue that to say the degree of care chargeable to the defendant must be commensurate with the danger is to make the defendant an insurer. We cannot accept this view. Other definitions of the word given by Webster are "proportionate" and "corresponding." As applicable to the case in hand, we think the jury would not fail to understand and accept the language of the instruction asked for by the plaintiff as meaning, not that the defendant was to be held as an insurer, but that the care owing by it was to be "proportionate to," or "measured by," the danger, and this undoubtedly is the true rule as established by the overwhelming weight of authority.

[4-6] It is urged upon us that the jury knew as well as the court that electricity was dangerous, and that the court, therefore, was right in not directing attention to the danger, and yet counsel for defendant practically concede that the instructions given would have been wrong if the court had not referred to "the nature of electricity." What particular property of electricity was it which, from plaintiff's standpoint, called for a reference to its nature? Was it the silent and invisible operation of the force? Was it the wide practical usefulness of the electrical business? Or was it the danger in dealing with electrical power and equipment? Undoubtedly it was the latter, and this being true, it seems to us to follow plainly that the plaintiff had the right to have the court tell the jury in so many words that the danger of the situation was to be specifically considered by them in determining the measure of the de-

fendant's care. The question is one of too much public importance, affects too many lives and too much property, and the opportunity and ability to know and guard against the danger are too clearly and peculiarly with the persons producing and furnishing electricity, to admit of any mincing of words in laying down the rule of duty which should regulate the business. There was undoubtedly no error in using, on defendant's behalf, the language of its instructions. This would not have resulted in any necessary conflict with the different language requested in the instructions for the plaintiff, but it is well settled that each party has the right to have presented to the jury its contention upon vital points in language to be chosen by it, provided such language is in keeping with the law. We have no difficulty in holding that the court erred in refusing to instruct the jury in clear and unmistakable terms on behalf of the plaintiff, that persons engaged in the development and distribution of electricity are charged with the duty of exercising a high degree of care—a care commensurate with the danger of the instrumentality—and that if their failure to exercise such care results in injury to persons or property, a legal liability follows. The facts make the law, and the jury ought to be told what it is. .

The views above expressed as to the meaning of ordinary care, and its measure in cases like this, are fully supported by the authorities.

In *Richmond & P. Ry. Co.* v. *Rubin,* 102 Va. 809, 812, 47 S. E. 834, 835, Judge Buchanan said: "It is true, as insisted by counsel for defendant company, that in the construction and maintenance of its wires under the telephone wires, it was only required to exercise reasonable or ordinary care. But what is reasonable or ordinary care is to be graduated and determined by the danger under all the circumstances of the case. The danger to persons and property from permitting a telephone wire to come into

contact with a trolley wire, heavily charged with electricity, is very great, and the care required to avoid such contact must be commensurate with the danger. 1 Thompson on Neg. (2d ed.) secs. 797, 804; Joyce on Electricity, sec. 445."

In *Norfolk Ry. & L. Co.* v. *Spratley*, 103 Va. 379, 381, 49 S. E. 502, 503, Judge Harrison said: "While electric companies are not held to be insurers against accident, still it is due to the citizen that such companies, permitted as they are to use for their own purposes the streets of a city or town, should be held to the exercise of a high degree of care in the construction and maintenance of the dangerous appliances employed by them; to the end that travelers along the highway may not be injured. The danger is great, and care and watchfulness must be commensurate with it."

In *Barrickman* v. *Marion Oil Co.*, 45 W. Va. 634, 647, 32 S. E. 327, 331, 334, 44 L. R. A. 92, the court said: "In *Berns* v. *Coal Co.*, 27 W. Va. 285 (Syl. point 7), it is held that 'negligence' and 'ordinary care' are correlative terms. What constitutes ordinary care depends upon the circumstances of each particular case. It is such care as a person of ordinary prudence would exercise under the circumstances. What are the circumstances of this particular case? Appellant was engaged in the business of transporting and furnishing to consumers an article of trade and traffic of the most delicate, explosive and inflammable nature, and very dangerous, and the care and diligence of the appellant must be commensurate with the danger incident to the handling of the commodity. * * * Appellant's instructions 10, 11 and 12 are drawn upon appellant's theory of 'ordinary care' only being incumbent upon it, and were properly rejected as presented, and should not have been given unless 'ordinary care' was so qualified in said instructions to be 'such care as is required by the dangerous character of natural gas.' "

In *Horne* v. *Consolidated Rys. L. & P. Co.*, 144 N. C. 375, 380, 57 S. E. 19, 21, the court said: "It is further an accepted principle that in the application and control of a dangerous agency like electricity, the term 'ordinary care' means the utmost degree of care in the construction, inspection and repair of their appliances, poles and wires. As said by Burwell, J., in *Haynes* v. *Gas Co.*, 114 N. C. 203, 19 S. E. 344, 26 L. R. A. 810, 41 Am. St. Rep. 786: 'The danger is great and the care and watchfulness must be commensurate with it.'"

In 3 Shear. & Red. on Neg. (6th ed.), sec. 698, the author says: "The business of supplying the public with electricity, like that of supplying gas, for lighting and other purposes, involves the handling of a highly dangerous agent, and therefore requires a corresponding degree of care on the part of one who undertakes it, to prevent injury to persons lawfully in any place where his wires are strung, whether over a highway or on a housetop."

Citing a vast array of authorities, the text in 8 Thompson on Negligence (White's Supplement 1914), sec. 797, uses this language: "*Reasonable care is proportionate to danger of mischief.*—Generally speaking, an electric company is not an insurer against injury, but the law demands of it the use of a degree of care commensurate with the risks and dangers involved in the business. The care must be proportionate to the danger reasonably to be apprehended."

There would be no profit in multiplying the quotations from or the bare citation of the authorities to the same general effect as those already mentioned. They are practically countless and substantially of one accord.

[7, 8] 2. In its rulings upon the admissibility of evidence, as well as in its instructions to the jury, the trial court held fast to the position that "the sole and only test of ordinary care in such a case is the common usage and practice of other like companies or persons engaged in a

similar business supplying a similar service under substantially similar conditions," using the words "common usage and practice" to mean "a fair average of such other companies engaged in a like business under similar conditions for similar service."

The correctness of this position depends upon the extent to which the rule of evidence known as the "unbending test of negligence" can properly be carried. As applied by the court in this case, it was, in our opinion, carried too far.

In human affairs we cannot look for better standards than those established by average humanity. The law presumes that every individual belongs to the average class and possesses and exercises average prudence. Hence the rule, that he who charges a lack of ordinary care must prove it, and hence, too, the general rule, that the custom or usage of a fair average of men or companies similarly situated and engaged is to be taken as reasonably safe. It must always be remembered, however, that the reason why such a test is generally fair is that the average man is presumed to be ordinarily prudent. It is said by the Pennsylvania court in the leading case of *Titus* v. *Railroad Co.*, 136 Pa. 618, 20 Atl. 517, 20 Am. St. Rep. 944, frequently cited in the kindred decisions of this court, "the standard of due care is the conduct of the average *prudent* man." The presumption of prudence may be rebutted. Fairly average men and companies often do imprudent things. Coming down to the precise question in this case, it ought not to require any argument to show that if the method resorted to by the lineman in testing the transformer *was not reasonably adequate for the purpose,* the employment of that method, instead of another available and efficient one, was not only an idle performance, but a failure of duty which could not be excused by any amount of common use. In other words, unless the method is reasonably adequate, its use would be contrary to average common sense and judg-

ment. An act or omission may be so clearly negligent that the customary use of the same degree of care by others in like circumstances becomes immaterial. *Canadian N. R. Co.* v. *Senske*, 201 Fed. 637, 643, 120 C. C. A. 65.

In the instant case the plaintiff offered proof which, if the court had allowed its introduction, would have tended to prove, and might have convinced the jury, that the test used was not merely inadequate but inappropriate and of no use at all for the purpose of discovering whether the red glow in the lamps after the storm was due to a dangerous defect in the transformer. This evidence was especially important and significant in view of the fact that the lineman who made the test had not been informed (although the company knew) that the lights in the house had been burning dimly, indicating that the transformer might have been damaged, after the lights had suddenly gone out in the storm.

The case of *Bertha Zinc Co.* v. *Martin*, 93 Va. 791, 22 S. E. 869, 70 L. R. A. 999, undoubtedly held, as claimed by defendant, that ordinary care is to be determined by the general usages of the business, and that no man can be held to any higher degree of skill than the fair average of his profession; and the same is true of *Norfolk Traction Co.* v. *Ellington*, 108 Va. 245, 61 S. E. 779, 17 L. R. A. (N. S.) 117; *Norfolk & Portsmouth Traction Co.* v. *Daily*, 111 Va. 665, 69 S. E. 963; *Southern Ry. Co.* v. *Foster*, 111 Va. 770, 69 S. E. 972, and some more recent cases. We do not think, however, that any of these decisions intended to hold that the so-called "unbending test" of negligence could be invoked, even in a case between master and servant, to exempt a defendant from liability where he had used an appliance or method known not to be reasonably adequate when one of the latter character was available. If they can be properly so construed, we are prepared to engraft a qualification.

We are not meaning to pass on the weight of the evidence. There was testimony to show that the test was reasonably

adequate, but there was also an offer of evidence to prove that it was not, and the court ought not to have excluded the latter, as it did, upon the theory "that the sole and only test was the common usage."

In the case of *N. & W. Ry. Co.* v. *Cromer*, 101 Va. 667, 671, 44 S. E. 898, this court said, that "courts and juries cannot dictate to railway companies a choice between methods *all of which are shown to be reasonably adequate for the purposes intended to be subserved;*" and in *Norfolk Traction Co.* v. *Ellington*, 108 Va. 245, 61 S. E. 779, 17 L. R. A. (N. S.) 117, it was said that "the right of selection *among reasonably adequate and safe methods and instrumentalities rests wholly with the master."* (Italics added). The contention may be made that customary use shows due care and thus proves reasonable adequacy. We concede that this is true and is conclusive of the question unless there is legal proof to the contrary.

In *Richmond & P. Ry. Co.* v. *Rubin, supra,* 102 Va. p. 814, 47 S. E. 834, Judge Buchanan (who also delivered the opinion of this court in *Bertha Zinc Co.* v. *Martin*), condemning a proffered instruction based upon general usage and custom, said: "The defendant introduced witnesses more or less experienced in the construction and maintenance of electric lines, who testified that they had never known guard-wires to be permanently used to prevent telephone wires from coming into contact with trolley wires. Their evidence did not establish the fact that such was the general usage or custom of ordinarily prudent persons engaged in the business of operating electric lines. If it had, it would not have brought the case within the doctrine laid down in *Bertha Zinc Co.* v. *Martin*, 93 Va. 791, 22 S. E. 869, as the counsel for plaintiff in error contends.

"In this case the defendant was using a highly dangerous motive power, and, as we have seen, as in the use of steam power, it was its duty to avail itself of the best me-

chanical contrivances and inventions in practical use which are effectual in preventing injury to private property from its wires coming into contact with the telephone wires. Such a high degree of care is not incumbent upon the master towards his servant. 'The master,' says ·Shearman & Redfield (1 Shear. & Red. on Neg., section 195), and this is well settled law, 'is not required to use more than ordinary care and diligence (as already defined) for the protection of his servants, under circumstances which would entitle a passenger or stranger to the use of great or extreme care. * * * The master is not bound to provide the very best materials, implements or accommodations which can be procured, nor those which are absolutely the most convenient and most safe. His duty is discharged by providing those which are reasonably safe and fit.' *Bertha Zinc Co.* v. *Martin, supra; N. & W. Ry. Co.* v. *Cromer*, 99 Va. 763, 40 S. E. 54. See also Thompson on Neg., sections 30 to 32.

"Whether or not the defendant had exercised the proper degree of care in guarding its wires from coming into contact with the telephone wires, was a question for the jury, to be determined by all the facts and circumstances of the case, under the instructions of the court. The question of negligence, or due care, is one peculiarly within the province of the jury, and cannot be established as a matter of law by a state of facts about which reasonably fair-minded men may differ. *Carrington* v. *Ficklin*, 32 Gratt (73 Va.) 670; *Kimball & Fink* v. *Friend*, 95 Va. 140, 27 S. E. 901."

[9] We do not think there is any substantial conflict between the *Rubin Case* and the case of *N. & P. T. Co.* v. *Daily, supra*, the latter of which is strongly relied upon by the defendant in the instant case. Both of the cases applied the principle of ordinary care. The *Rubin Case* shows that ordinary care requires a higher degree of diligence on the part of the electric companies towards outsiders than they owe to their employees. As to the former, they must, in the

exercise of ordinary care, use "the best mechanical contrivances and inventions in practical use;" as to the latter, ordinary care does not require them to furnish the best, but only those which are "reasonably safe and fit." In either class of cases, the general usage of the business is satisfactory and conclusive proof of ordinary care unless the presumption thus arising is rebutted. In the *Rubin Case* the court said, in effect, that even if the evidence had shown that the methods of the defendant were in accord with general usage among companies of that kind, the instruction was wrong because there was evidence tending to show that there were other and better methods in practical use, the adoption of which the company, in the exercise of ordinary care in such a case (as contrasted with a master and servant case), ought to have employed. In the *Daily Case,* which also did not involve the relation of master and servant, the court found no sufficient evidence upon which to hold that there were any safer methods than those used by the defendant, and accepted the general usage proven in the case as satisfactory evidence of ordinary care.

In *Southern Ry. Co.* v. *Blandford,* 105 Va. 373, 54 S. E. 1, the opinion was delivered by Judge Cardwell, who also wrote the opinion in the *Daily Case,* and the following is an extract from the former: "In section 461, 1 Wigmore on Evidence, the distinction is drawn between the use of facts as to custom and usages of others conducting a similar business, and their use as involving a standard of conduct in substantive law. He (the author) says: 'The distinction is in itself a simple one. The conduct of others evidences the tendency of the thing in question; and such conduct * . * * is receivable with other evidence, showing the tendency of the thing is dangerous, defective, or the reverse, and that its maintenance was or was not negligence, in spite of the above evidence. Meanwhile the substantive law tells them what the standard of conduct for negligence is; and

91

this standard is a fixed one independent of the actual conduct of others. To take that conduct as furnishing a sufficient legal standard of negligence would be to abandon the standard set by the substantive law and would be improper. The conduct of others, then, is receivable as some evidence of the nature of the thing in question, because it indicates what is the influence of the thing on the ordinary person in that situation; but it is not to be taken as fixing a legal standard for the conduct required by law. This distinction is patent enough but it is sometimes judicially ignored. Such evidence is sometimes excluded on the erroneous supposition that the mere reception of it implies that it is to serve as a legal standard of conduct.' "

In 1 Thomp. on Neg., section 31, it is said: "But it is very hard to extract any well defined or satisfactory rule from the decisions which speak upon this question. A *general custom* of the persons or corporations engaged in a given business; to conduct that business in a given way or with given means, would seem to afford the most satisfactory evidence in support of the conclusion that they were conducting it with ordinary care. But when we come to consider that the standard demanded by the law is not the ordinary care of men generally, but the *ordinary care of prudent men,* engaged in a particular employment or specialty, we must conclude that a custom which admits of a lower standard of care is a bad custom."

In 1 Sher. & Red. on Neg. (6th ed), section. 12-a, it is said: "The custom of others engaged in the same pursuit, though generally admissible as evidence by either party as tending to show negligence, or the contrary, is not conclusive. What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it is usually complied with or not."

In 8 Thomp. on Neg. (White's Supplement 1914), section

3777, the text says: "Generally speaking, a master is not chargeable with negligence if he conducts his business in the same manner as other prudent persons customarily conduct the same kind of business. But a customary method must be a reasonably safe method."

In *Wabash R. Co.* v. *McDaniels*, 107 U. S. 454, 461, 2 Sup. Ct. 932, 938, 27 L. Ed. 605, 608, Mr. Justice Harlan, delivering the unanimous opinion of the court, in answer to the contention of counsel in that case that ordinary care in the selection of railroad employees meant only that degree of diligence which is customary and sanctioned by general practice and usage among those entrusted with the management of railroads, says: "To this view we cannot give our assent. There are general expressions in adjudged cases, which apparently sustain the position taken by counsel. But the reasoning upon which these cases are based is not satisfactory, nor as we think consistent with that good faith which at all times, should characterize the intercourse between officers of railroad companies and their employees. * * *

"And to say, as a matter of law, that a railroad corporation discharged its obligation to an employe—in respect of the fitness of coemployes, whose negligence has caused him to be injured—by exercising, not that degree of care which ought to have been observed, but only such as like corporations are accustomed to observe, would go far towards relieving them of all responsibilities whatever for negligence in the selection and retention of incompetent servants.

"If the general practice of such corporations in the appointment of servants is evidence, which a jury may consider in determining whether, in the particular case, the required degree of care was observed, such practice cannot be taken as conclusive upon the enquiry as to the care which ought to have been exercised. A degree of care ordinarily

exercised in such matters may not be due, or reasonable, or proper care, and therefore not ordinary care, within the meaning of the law."

It must be conceded that it is difficult to determine just how far the decisions in Virginia have intended to adopt custom and usage as the standard and measure of ordinary care; and the authorities generally are in hopeless conflict upon the subject, with perhaps a majority supporting the view contended for by counsel for defendant in this case. The authorities *pro* and *con* are very fully set out in a copious note to the valuable case of *Wita* v. *Interstate Iron Co.,* 103 Minn. 303, 115 N. W. 169, 16 L. R. A. (N. S.) 128 (holding that general usage is not conclusive). The note referred to is found in 16 L. R. A. (N. S.) page 128 *et seq.,* from which we quote the following:

"There is an irreconcilable division of opinion upon the question whether or not a master, in furnishing appliances for his servant's use, has fulfilled his duty in that regard by furnishing those which are ordinarily used in the business. Some courts, perhaps a majority of them, have adopted a rule which may be thus expressed: Where the only inference that can be reasonably drawn from the evidence is, that the master has conformed to the general usage of the business in respect to furnishing instrumentalities for the servant's use, he should, as a matter of law, be declared to have been in the exercise of due care, and therefore guiltless of negligence. Other courts refuse to accede to such a proposition, and have declared the correct rule to be that the mere fact that the instrumentality in question has been commonly adopted by prudent employers in the same business is not conclusive upon the question of negligence, though it is a circumstance to be considered in determining that question. Mere usage, these courts say, should not be permitted to establish that that which was in fact unnecessarily dangerous was in law reasonably safe as against persons

towards whom there was a duty to exercise due care. That is to say, custom is not to be considered an excuse, if the custom itself is negligent.

"Taking up the first doctrine that compliance with usage is conclusive of the lack of negligence on the master's part, we find the rule expressed in language which, if taken literally, would imply that the generality of the usage and a similarity of the business are the only points to be considered, and that the manner in which the business is conducted and the character of the persons engaged therein are not material. But it is submitted, and the proposition, as will be seen, is supported by many of the authorities, that, under the general principles of the law of negligence, these elements ought to be material, and that the test really propounded is the usage prevailing among prudent employers in well-regulated concerns, and not the usage of imprudent masters in ill-regulated concerns."

[10, 11] The pertinent rules and principles which, in our opinion, are fairly deducible from the authorities and ought to prevail, may be briefly summed up as follows: Persons engaged in the development and distribution of electricity owe to their employes the duty of exercising ordinary care to furnish them reasonably safe surroundings, materials and appliances; and to their customers and all others who for business or pleasure have the right to be in reach of the current, the duty of exercising ordinary care to avail themselves of the best materials, and the best mechanical contrivances and inventions which are in practical use, to prevent personal or property injuries to such customers and such other persons.

Ordinary care in all such cases, whether affecting employes or strangers, demands a higher degree of diligence and foresight than is required in affairs involving less hazard, and must be graduated and measured by the danger.

[12] The general usage of the business in a given situation is admissible as evidence of what is reasonable and proper to be done in that situation, from which, along with the other (if there be other) pertinent facts and circumstances of the case, the jury are to determine the question of negligence. If there be no conflict of evidence as to the existence of the general usage, and nothing in the evidence tending to show, as to employes, that the usage was not reasonably safe or adequate for its purpose and occasion, and nothing, as to strangers, tending to show that the usage did not afford as high protection as would result from any other known and practical methods of the business, then the usage itself is conclusive evidence of the exercise of ordinary care, and no verdict to the contrary should be upheld.

The argument is made in some of the authorities which apply the so-called "unbending test" literally, that where the jury is allowed to go outside of the general usage of the business, the weight and force of the usage as evidence is destroyed, and the jury is left without any standard by which to determine the question of negligence. As a matter of fact, however, they are constantly given the same ultimate, though confessedly broad and general, not to say unrestricted, standard of ordinary care by which to determine negligence is cases involving no usages or customs of business, namely, such care as an ordinarily prudent person would be expected to exercise in the premises. As Judge Buchanan said in *Richmond, &c. Co.* v. *Rubin, supra,* "the question of negligence, or due care, is one peculiarly the province of the jury, and cannot be established as a matter of law by a state of facts about which reasonably fairminded men may differ." This rule, as we think, is preserved, and yet fairly guarded against abuse by arbitrary and unwarranted findings, by the principles which we have above stated.

The court erred in telling the jury that "the sole and

only test of ordinary care in such a case is the common usage and practice of other like companies or persons engaged in a similar business supplying similar service under substantially similar conditions at the time the fire occurred;" and in refusing to allow the plaintiff to introduce proof tending to show that the test used by the linemen was inappropriate and inadequate to the occasion, and that there were appropriate and adequate tests known to the business and in practical use, whether in general use or not.

The seriousness of this error to the plaintiff is apparent. Under the evidence actually admitted, the jury might have believed that the transformer was injured by the storm, and not, as defendant contended, after and by reason of the fire. They were bound to believe, because it was not disputed, that the defendant itself knew of and used, after the fire, another and adequate test, which showed, what the first one used did not show, the then dangerous condition of the transformer. But they could not find for the plaintiff on those facts because the test used was shown to be, and the better one was not shown to be, in common average use, and the instructions held them to usage as the sole standard. Again, they were bound to believe, for it was not disputed, that ground wires were in practical use, the evidence being in conflict as to whether such a device was (1) in common average use, or (2) adequate as a protection against a damaged transformer. They might have believed that the evidence established the latter but did not establish the former of these two disputed propositions, and yet could not have found for the plaintiff because the instructions held them to the former as the sole test of liability.

Of like tendency, and not less serious, was the error in refusing to allow the plaintiff to prove, if he could, that the test used was inadequate and that there were other tests which were adequate and in practical use, unless he could also prove that the one used by the company was not in com-

mon average use, and the ones attempted to be shown by him were in such use.

It is insisted, however, that we cannot consider the exceptions to the ruling of the court upon the admission of evidence because the record does not show what the answers of the witnesses on the question at issue would have been. The facts in this regard are these: The plaintiff propounded repeated questions to witnesses about the character of the test which was used, and plainly intended to show, first, that the one in question was not reasonably adequate for the purpose for which it was used; and, second, that there were other tests in practical use by other companies which would have been far more reliable. The theory of the objection urged to these questions was that the jury had no right to go beyond the common usage of other like companies engaged in similar business rendering similar service under substantially similar conditions; and that if the used test was in such common use, it mattered not what other or how many other and better tests were also known and used by other companies. It was upon this theory that the court excluded the evidence, and gave the instructions to the jury dealing with that particular question. No one connected with the case could have had any doubt as to the substance of the answers which counsel for plaintiff expected to elicit by the questions objected to, but they did not at the time undertake to show by avowal or otherwise what the answers would be. Exceptions were noted each time to the action of the court, and all parties fully understood what the real point at issue was. After the verdict had been rendered, there was a motion for a new trial, which the court took under advisement. For some reason not appearing in the record, but for which we may safely assume the diligent and capable trial judge was not responsible, this motion was pending and remained undecided for three years. Finally it was disposed of adversely to the plaintiff. Thereupon,

and before the final order overruling the motion was actually entered, counsel for the plaintiff asked permission to call in the various witnesses whose testimony had been excluded in the manner above set out and have them then and there state what their answers would have been. To this procedure counsel for the defendant objected, on the ground that such a practice had never been followed in this State, and that it would be manifestly improper. The court, however, announced that it would, before entering the final order, permit the witnesses to come in and state what their answers would have been. Thereupon, to save time, counsel agreed upon what the witnesses would then have stated, counsel for defendant not waiving their objection to the procedure, and not admitting "that the witnesses would have made the same answers at the trial." These answers, as shown by the record thus made up, were favorable to the plaintiff's view, and tended to show, among other things, first, that the test used by Maitland was useless in determining the particular character of trouble in the transformer which was afterwards shown to exist, and, second, that there were other well-known and adequate tests known to the electrical profession and in practical use by at least some companies engaged in that line of business. Thereupon, with all of these facts before it, the court entered the order overruling the motion and awarding final judgment for the defendant.

[13-15] It is, of course, well settled that any error complained of must appear to have been prejudicial, and it is, therefore, ordinarily true that when a witness is asked a question to which an objection is sustained, if the record does not show by necessary implication, or by a statement of the witness, or by an avowal of counsel, what answer was expected, the exception cannot be availed of in the appellate court because that court cannot tell whether the answer would have been favorable or unfavorable to the

92

party excepting. It is likewise undoubtedly true, and we do not mean to sanction anything to the contrary, that fairness to the lower court and the due and proper administration of justice demand that the trial judge himself should know before the case goes to the jury what the party excepting to his ruling expected to prove by the evidence excluded. The reason of the law, however, is the life of the law, and there is no ground to imagine in this case that the trial court had the least doubt about what counsel for plaintiff expected and had reason to believe these witnesses would say. The fixed view of the court is shown by its rulings throughout the trial, and by the instruction that the "sole and only test of ordinary care in such a case is the common usage and practice of other like companies," which entirely ignored the plaintiff's insistent contention that the test in common usage in this case was not reasonably adequate for the purpose. That the court did understand what these witnesses were expected to show, and would have ruled just as it did if express avowals had been made at the trial, seems to be further conclusively settled by the course which it took in entering a final judgment for the defendant after it was made to appear that the answers, if admitted, would have been favorable to the plaintiff.

[16, 17] 3. The parties are not agreed as to the measure of damages, in case the plaintiff should be entitled to recover. Damages are claimed for destruction of the dwelling house and certain shade trees and shrubbery, destruction of certain personal property in the house, and injury to shade trees, to a cottage, and to certain personal property not wholly destroyed by the fire.

The plaintiff undertook to fix the amount of such damages by showing the original cost and the probable cost of replacement. This method of proof was practically unchallenged by the defendant, except that on cross-examination the plaintiff's witnesses were asked a number of questions

as to the market value of some of the property. No market value was shown. In this state of evidence, the plaintiff asked for the following instructions.

"If the jury believe from the evidence that the fire which destroyed and injured the property of the plaintiff and his said assignees was caused by the negligence of the defendant company, or its employes, they should find for the plaintiff, and allow him damages equal in the value of such property as was destroyed and to the damages done to such as was injured, and the court further instructs the jury that if they find that the plaintiff is entitled to damages done by the fire they may allow interest on the amount of damages done by the fire and fix the period at which such interest shall commence."

The court refused to give this instruction, and in lieu thereof, over plaintiff's objection, gave the following:

"The court instructs the jury that if they should find upon the evidence and under the instructions of the court that the defendant is liable to the plaintiff for the destruction of and damage to his property by fire as alleged in the declaration, they must assess the damages at an amount which they believe from the evidence will cover the actual loss sustained not to exceed the amount alleged in the declaration. The jury are instructed that in assessing damages in this case they must endeavor to ascertain from the evidence the fair market value of the property destroyed in its condition at the time of the fire. Fair market value means the cash value of the property if sold on the market under ordinary circumstances and does not mean the original cost to the owner, or the cost of replacing the property in a new condition. The burden is upon the plaintiff to show by clear evidence the fair market value of the property at the time of its destruction in the condition in which it was at that time. The jury cannot arrive at this value by surmise, approximation or guess, but must do so from clear and definite evidence."

We are of opinion that the court ought to have given the instruction asked for by the plaintiff, with the additional statement that the value was to be fixed at the time of the fire.

It is probable that no market value could have been shown for any of the property. Dwelling houses and shade trees apart from the land, and partly used or damaged personal property, although susceptible of valuation, are not usual articles of trade. If, however, as a technical proposition, the market value is to be taken as the correct basis for the measure of damages, the failure of the defendant to object to the plaintiff's method of proof, or to offer countervailing evidence, placed the latter in a position to ask for a verdict upon the proof of value introduced. *C. & O. Ry Co.* v. *May,* 120 Va. 790, 795-6, 92 S. E. 801; *Vaughan* v. *Mayo Milling Co.,* 127 Va. 102 S. E. 597.

In *N. & W. Ry Co.* v. *Bohannon,* 85 Va. 293, 297, 7 S. E. 236, 238, a suit to recover damages for destruction of fruit trees by fire, this court said: "The instruction given by the court * * * stated the rule in cases of this kind, as well, perhaps, as it can be done, when it said that 'the measure of recovery is the value of the property destroyed."

In *N. & W. Ry. Co.* v. *Thomas,* 110 Va. 622, 627, 66 S. E. 817, a suit for damages for the destruction of a dwelling house by fire, this court expressly approved the rule laid down in the *Bohannon Case,* and held that the measure of damages for a house destroyed by fire is the value of the house at the time of the destruction.

The foregoing cases were referred to and tacitly approved in *C. & O. Ry. Co.* v. *May, supra,* the opinion in the latter calling attention to the fact that neither of the cases cited "lays down the means by which such value may be determined."

If the plaintiff is entitled to recover at all, his compensation should be the money value of the property destroyed and

the money loss for the property injured, fixed as of the time of the fire, and we think that, under the evidence, the plaintiff's instruction, as asked, with the amendment we have suggested, would have been substantially correct and would have enabled the jury to arrive at a fair and just estimate of the amount he ought to be allowed if they found in his favor.

It follows from what has been said that the judgment must be reversed, the verdict of the jury set aside, and the cause remanded for a new trial to be had in conformity with the views herein expressed. The evidence introduced, along with that which ought to have been allowed, results in such a conflict upon the vital points in the case that we are unable to sustain the verdict upon the defendant's contention that, regardless of the court's ruling on the other questions, no different verdict could properly have been found. We have not intended, however, by anything said in the course of this discussion, to indicate any opinion as to what verdict the jury should find upon a proper presentation of the evidence and under proper instructions as to the law of the case.

*Reversed.*